Argued and submitted March 17, 2015, reversed and remanded
October 12, 2016

David T. BICE, Ph.D.,
*Petitioner,*

*v.*

BOARD OF PSYCHOLOGIST EXAMINERS,
*Respondent.*

Board of Psychologist Examiners
2009035, 2010007; A153028

383 P3d 913

Steven J. Sherlag argued the cause and filed the briefs for petitioner.

Carolyn Alexander, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Hadlock, Chief Judge, and Prall, Judge pro tempore.*

---

\* Hadlock, C. J., *vice* Nakamoto, J. pro tempore.

## ARMSTRONG, P. J.

Petitioner, a psychologist, seeks judicial review of a final order of the Board of Psychologist Examiners in which the board concluded that petitioner had violated professional standards in his treatment of one of his clients and imposed sanctions. We first reject without discussion petitioner's challenge to the denial of his motion to dismiss based on investigatory misconduct. In his remaining assignments of error, petitioner principally argues that the board erred in modifying key findings of historical fact made by the administrative law judge (ALJ). On *de novo* review of the record under ORS 183.650(4), and as explained in detail below, we find that key disputed historical facts are not as found by the board. Because we must remand to the board for reconsideration and entry of an order consistent with our findings on those disputed historical facts, ORS 183.650(4), we do not reach petitioner's assignments of error related to the board's application of the professional standards to his conduct.

A detailed discussion of the allegations against petitioner and the evidence presented at the contested case hearing would be of no value to the bench, bar, parties, or public. Thus, except as supplemented below in our analysis, we only briefly set out the background facts here, which are taken from the board's findings that petitioner does not dispute, as supplemented by uncontroverted evidence in the record.

Petitioner has been licensed as a psychologist in Oregon since 1975 and has not previously been subject to disciplinary action by the board. In August and September 2003, SM, an 18-year-old woman,[1] saw petitioner as a client for seven sessions. SM had decided to stop seeing her prior therapist because she did not like the advice she was receiving and began seeing petitioner, who had been her father's therapist, to help her process her grief over her father's sudden death, before she left the state for college. SM's mother filed a complaint against petitioner shortly after SM stopped treating with him based on allegations that petitioner had behaved in a manner that made SM uncomfortable,

---

[1] SM turned 18 the day after her first session with petitioner.

"indicating that [petitioner's] behavior with SM was personal and physical without being overtly sexual." The board dismissed that complaint because SM told her mother that she did not want to pursue the complaint herself and did not sign a release for her records. The board, which it now admits was in violation of its own rules, deliberately decided not to notify petitioner about the complaint or the dismissal.

In 2009, the father of SC, a female client of petitioner, filed a complaint against petitioner based on two birthday cards and a high school graduation card petitioner had sent to SC, when SC was still a minor. SC did not provide a release of her medical records for the investigation. In an interview, SC stated that petitioner had never acted inappropriately toward her and called her father's complaint an attempt at "emotional revenge" by her father who "wanted control" and was opposed to SC seeking therapy.

In addition, the board's investigator, Berry, contacted another of petitioner's female clients, DC, after DC's father filed a complaint about petitioner's billings. Berry told DC that her call had nothing to do with DC's father and told DC that "several young women" had come forward accusing petitioner of inappropriate conduct. DC told Berry that petitioner was never inappropriate with her, but, in the course of the conversation, became very uncomfortable because Berry was being manipulative, kept trying to take her comments out of context, and insinuated that petitioner had done something wrong. As a result, DC filed a complaint with the board against Berry, which the board declined to pursue. Berry admitted that she had tried to press DC into saying that petitioner had acted inappropriately toward DC.[2]

In 2010, the board reopened the complaint involving SM because SC's father had filed his complaint. At that time, SM agreed to cooperate in an investigation against petitioner at the urging of Berry and her mother after Berry told her and her mother that the board had received a complaint involving a "similar situation." The board pursued

---

[2] Unlike the board, we consider Berry's investigation in relation to DC relevant to our assessment of the evidence in undertaking our *de novo* review under ORS 183.650(4).

this disciplinary action against petitioner based on the allegations relating to SM and SC.

A contested case hearing was held before the ALJ in November 2011. During that hearing, 14 witnesses testified, including petitioner, SM, SM's mother, SC's father, Berry, colleagues of petitioner, and expert witnesses. The ALJ also received many exhibits, including petitioner's notes of his sessions with SM, diary entries made by SM during the time that she saw petitioner, Berry's notes, petitioner's investigator's notes of a conversation with SC, the three cards that petitioner had sent SC, as well as other exhibits. The ALJ issued a 19-page proposed order that determined that the board had failed to prove that petitioner had violated professional standards in his treatment of either SM or SC.

The board subsequently issued an amended proposed order that concluded petitioner had violated professional standards with regard to his treatment of SM and imposed sanctions, but agreed with the ALJ that it had not proved violations with regard to SC. Petitioner filed exceptions to that order. The board then issued its 31-page final order, which is the subject of this judicial review.

The final order rejected petitioner's exceptions and adhered to its conclusions in the amended proposed order. Petitioner does not challenge the board's findings, as clarified in the board's response to petitioner's exceptions, that petitioner would sit next to SM during sessions, put his arm around SM to comfort her when she cried during sessions, and hugged SM at the end of sessions; and that SM subjectively felt uncomfortable. Petitioner does challenge on judicial review several aspects of the board's final order that differ from the ALJ's proposed order. The most significant of those differences include the board's finding that its investigator, Berry, acted appropriately and did nothing to taint the reliability of the evidence, crediting all of SM's testimony at the hearing, rejecting portions of petitioner's testimony as incredible or unpersuasive, finding its own expert's testimony more persuasive than petitioner's expert in key respects, and modifying historical facts found by the ALJ, which we discuss in detail below.

The board concluded that petitioner's conduct in his sessions with SM violated ORS 675.070(2)(d)[3] (unprofessional conduct), Ethical Standard 2.01 (boundaries of competence), Ethical Standard 3.04 (avoiding harm), and Ethical Standard 10.01 (informed consent).[4] The board con-

---

[3] ORS 675.070(2)(d) provides:

"(2) The board may impose a sanction listed in subsection (1) of this section against any psychologist or psychologist associate or applicant, or, if applicable, any unlicensed person found in violation of ORS 675.010 to 675.150, when, in the judgment of the board, the person:

"* * * * *

"(d) Is guilty of immoral or unprofessional conduct or of gross negligence in the practice of psychology, including but not limited to:

"(A) Any conduct or practice contrary to recognized standard of ethics of the psychological profession or any conduct or practice that constitutes a danger to the health or safety of a patient or the public, or any conduct, practice or condition that adversely affects a psychologist or psychologist associate's ability to practice psychology safely and skillfully.

"(B) Willful ordering or performing of unnecessary tests or studies, administration of unnecessary treatment, failure to obtain consultations or perform referrals when failing to do so is not consistent with the standard of care, or otherwise ordering or performing any psychological service or treatment which is contrary to recognized standards of practice of the psychological profession[.]"

[4] The Ethical Standards cited by the board are from the American Psychological Association's "Ethical Principles of Psychologists and Code of Conduct." At the time of the hearing in this case, the board had adopted the 2002 version of those standards, OAR 858-010-0075 (Mar 26, 2008), and petitioner does not argue that an earlier version should have been applied to his conduct. Thus, we rely on the 2002 standards, as did the ALJ and the board below.

Ethical Standard 2.01, boundaries of competence, provides:

"(a) Psychologists provide services, teach, and conduct research with populations and in areas only within the boundaries of their competence, based on their education, training, supervised experience, consultation, study, or professional experience.

"(b) Where scientific or professional knowledge in the discipline of psychology establishes that an understanding of factors associated with age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, or socioeconomic status is essential for effective implementation of their services or research, psychologists have or obtain the training, experience, consultation, or supervision necessary to ensure the competence of their services, or they make appropriate referrals, except as provided in Standard 2.02, Providing Services in Emergencies.

"(c) Psychologists planning to provide services, teach, or conduct research involving populations, areas, techniques, or technologies new to them undertake relevant education, training, supervised experience, consultation, or study.

"(d) When psychologists are asked to provide services to individuals for whom appropriate mental health services are not available and for which

cluded that petitioner violated those professional standards because petitioner used touch as a therapy intervention with SM (an "emerging area" in psychology) without "first establishing a strong therapeutic alliance" and while failing to monitor SM's reactions to being touched, failing to make chart notes documenting his use of touch and his rationale for doing so, and failing to address touch with SM in his intake informed-consent documents or in his chart notes, and because SM was "strongly" affected "to the extent that she will never see a male counselor again."

On judicial review, petitioner challenges the board's modifications in the final order, challenges the board's

---

psychologists have not obtained the competence necessary, psychologists with closely related prior training or experience may provide such services in order to ensure that services are not denied if they make a reasonable effort to obtain the competence required by using relevant research, training, consultation, or study.

"(e) In those emerging areas in which generally recognized standards for preparatory training do not yet exist, psychologists nevertheless take reasonable steps to ensure the competence of their work and to protect clients/patients, students, supervisees, research participants, organizational clients, and others from harm.

"(f) When assuming forensic roles, psychologists are or become reasonably familiar with the judicial or administrative rules governing their roles."

Ethical Standard 3.04, avoiding harm, provides:

"Psychologists take reasonable steps to avoid harming their clients/patients, students, supervisees, research participants, organizational clients, and others with whom they work, and to minimize harm where it is foreseeable and unavoidable."

Ethical Standard 10.01, informed consent to therapy, provides:

"(a) When obtaining informed consent to therapy as required in Standard 3.10, Informed Consent, psychologists inform clients/patients as early as is feasible in the therapeutic relationship about the nature and anticipated course of therapy, fees, involvement of third parties, and limits of confidentiality and provide sufficient opportunity for the client/patient to ask questions and receive answers. (See also Standards 4.02, Discussing the Limits of Confidentiality, and 6.04, Fees and Financial Arrangements.)

"(b) When obtaining informed consent for treatment for which generally recognized techniques and procedures have not been established, psychologists inform their clients/patients of the developing nature of the treatment, the potential risks involved, alternative treatments that may be available, and the voluntary nature of their participation. (See also Standards 2.01e, Boundaries of Competence, and 3.10, Informed Consent.)

"(c) When the therapist is a trainee and the legal responsibility for the treatment provided resides with the supervisor, the client/patient, as part of the informed consent procedure, is informed that the therapist is in training and is being supervised and is given the name of the supervisor."

interpretation of the Ethical Standards as improper rule-making without notice, and argues that the record lacks substantial evidence to support the board's ultimate conclusions that he violated professional standards. Because we find several of the disputed historical facts are not as found by the board, we reverse and remand for the board to reconsider its decision, as required by ORS 183.650(4), and we do not reach petitioner's other challenges.

When an agency modifies an ALJ's findings of historical fact under ORS 183.650(3), we review those modified findings *de novo* under ORS 183.650(4), applying a preponderance of the evidence standard to our assessment of the record.[5] *Weldon v. Bd. of Lic. Pro. Counselors and Therapists*, 266 Or App 52, 63, 337 P3d 911 (2014), *rev den*, 356 Or 690 (2015). However, when an agency modifies an ALJ's order by making additional findings, it is a modification under ORS 183.650(2), which requires an explanation by the agency. We review additional findings for substantial evidence under

---

[5] ORS 183.650 provides:

"(1) In any contested case hearing conducted by an administrative law judge assigned from the Office of Administrative Hearings, the administrative law judge shall prepare and serve on the agency and all parties to the hearing a form of order, including recommended findings of fact and conclusions of law. The administrative law judge shall also prepare and serve a proposed order in the manner provided by ORS 183.464 unless the agency or hearing is exempt from the requirements of ORS 183.464.

"(2) If the administrative law judge assigned from the office will not enter the final order in a contested case proceeding, and the agency modifies the form of order issued by the administrative law judge in any substantial manner, the agency must identify the modifications and provide an explanation to the parties to the hearing as to why the agency made the modifications.

"(3) An agency conducting a contested case hearing may modify a finding of historical fact made by the administrative law judge assigned from the Office of Administrative Hearings only if the agency determines that there is clear and convincing evidence in the record that the finding was wrong. For the purposes of this section, an administrative law judge makes a finding of historical fact if the administrative law judge determines that an event did or did not occur in the past or that a circumstance or status did or did not exist either before the hearing or at the time of the hearing.

"(4) Notwithstanding ORS 19.415(3), if a party seeks judicial review of an agency's modification of a finding of historical fact under subsection (3) of this section, the court shall make an independent finding of the fact in dispute by conducting a review de novo of the record viewed as a whole. If the court decides that the agency erred in modifying the finding of historical fact made by the administrative law judge, the court shall remand the matter to the agency for entry of an order consistent with the court's judgment."

ORS 183.482(8)(c). *Weldon*, 266 Or App at 69-70; *Becklin v. Board of Examiners for Engineering*, 195 Or App 186, 206, 97 P3d 1216 (2004), *rev den*, 338 Or 16 (2005).

In taking *de novo* review of a modified finding of historical fact, when the fact is predicated on a witness's credibility or the persuasiveness of expert testimony—although neither is *per se* a "historical fact" in itself—we must make an independent assessment of that witness's credibility or the persuasiveness of the expert's testimony. *Corcoran v. Board of Nursing*, 197 Or App 517, 529, 107 P3d 627 (2005). We also must make an independent finding of the disputed historical fact based on a review of the record as a whole. *Id.* That is, we are not limited to choosing between the ALJ's finding and the agency's finding; instead, we must make the finding based on our independent assessment of how the evidence preponderates. *Id.* at 530. Because we make the finding independently, we are "free to determine that the evidence in the record is so unreliable that we cannot determine 'the fact in dispute' by a preponderance of the evidence." *Id.*

It is sufficient to invoke our *de novo* review of a modified finding if a petitioner points out the modification and provides record citations to the evidence that supported the ALJ's finding and that are contrary to the agency's finding. *WaterWatch of Oregon v. Water Resources Dept.*, 268 Or App 187, 227, 342 P3d 712 (2014); *Weldon*, 266 Or App at 64; *see also Corcoran*, 197 Or App at 526 ("Any petitioner who asks this court to engage in *de novo* review under ORS 183.650(4) *must specifically* identify *each* challenged modification of a finding of historical fact and *explain* why that modification was erroneous[.]" (Emphases in original.)). Here, plaintiff has met that standard, and, thus, we proceed to address his assignments of error challenging the board's modifications to the ALJ's findings of historical fact.

We begin by noting that, in addition to the findings of historical fact discussed below, petitioner also has assigned error to the board's modification of the ALJ's assessment of the reliability of SM's testimony, the nature of the board's investigation and alleged interference in petitioner's discovery efforts, the staleness of the evidence in SM's case, and

the persuasiveness of the competing expert testimony. As noted above, although those matters are not findings of historical fact that we are tasked with independently finding under ORS 183.650(4), we conclude that the modified findings of historical fact that we must confront are dependent on us making an independent assessment of those matters because they bear on the reliability of the evidence in the record. Thus, although we do not address those assignments of error separately, our independent assessment of those matters is incorporated in the findings that we make below.

In particular, it is our assessment that the reliability of the evidence has been negatively affected by the board's failure to properly inform petitioner of SM's mother's complaint when it was made, which resulted in petitioner not having recollections of the sessions with SM independent of his chart notes; the board's significant delay in investigating that complaint and interviewing SM; SM's inability to recall any details of her sessions with petitioner aside from details suggested by her mother's 2003 complaint; and the manner in which Berry investigated the matters, which likely influenced SM's recollections.

Turning to the modified findings, we first reject the board's modified finding that petitioner led SM out of his office after each session by grabbing her hips from behind and walking her out into the hall. We find that the evidence does not preponderate in favor of such a finding. Rather, we echo the ALJ in finding that SM's testimony in that regard was implausible based on her description of the conduct (grabbing both her hips from behind and walking one to two feet into the hallway like how children play "train"), the alleged frequency (every session), and the office layout and dynamics (several professionals on similar client schedules sharing the same hallway). In so finding, we iterate that we are not finding that the alleged conduct never happened, but, rather, we are finding that the board did not prove by a preponderance of the evidence that the conduct occurred.

The next modified finding challenged by petitioner that we address relates to an alleged kiss on the cheek that petitioner gave SM at the end of their last session. The ALJ found that there was some corroboration that petitioner

gave SM a kiss on the cheek, that petitioner denied the kiss, and that the evidence was at best inconclusive either way. In contrast, the board credited SM's testimony in general (which included testimony that petitioner tried to kiss her on the lips but kissed her cheek) and found that petitioner kissed SM on the cheek.

We first reject without discussion the board's preservation challenge to petitioner's assignment of error. We also reject the board's argument that it did not modify the ALJ's findings and that it did not find that petitioner had attempted to kiss SM on the lips. The board did find that petitioner attempted to kiss SM on the lips, at least implicitly, because the board explicitly credited all of SM's testimony on the matter. The board also explicitly found that petitioner *did* kiss SM on the cheek, which was a modification of the ALJ's findings. On *de novo* review, we find that petitioner did not attempt to kiss SM on the lips. However, we find that the evidence establishes that petitioner did give SM a kiss on the cheek goodbye at the end of their last session based on SM's contemporaneous accounts to her mother and in her diary.

We next address petitioner's challenge to the board's modified finding that petitioner used touch as a treatment modality in his treatment of SM. We reject the board's contention that it did not make such a finding. On review of the board's order, it is apparent that, not only did the board explicitly make the modified finding challenged by petitioner—as clarified by the board in its response to petitioner's exceptions—but that that finding was crucial to the board's conclusions that petitioner violated professional standards.

Petitioner's challenge to the modified finding here requires discussion of the underlying findings of the ALJ and the board, because it is those underlying findings that make the challenged finding significant. First, the ALJ noted in the proposed order that, presumably, the board cited Ethical Standard 2.01 (boundaries of competence) in its complaint against petitioner, "because the [b]oard considers the use of touch as a modality to fall within the 'emerging areas' noted in subsection (e)." The board agreed, without modification,

that that was the reason that it cited Ethical Standard 2.01.

Second, the ALJ found that, based on the expert testimony, there is a distinction between "touch as a modality" or "therapeutic touch," which is a controversial tool (that is, an "emerging area") that involves the conscious use of physical touch to treat a client's complaints, and the use of "general" touch or "comforting" touch, which can be part of the normal communication process. The ALJ found that any kind of touch "may or may not be appropriate depending on the circumstances of its use." The ALJ further found that petitioner makes a distinction between therapeutic touch and general touch, and that he does not use touch as a modality in his practice, but that he "sees some value in touch in the communication with his client, even if it is not a modality he uses." Although the ALJ did not explicitly categorize the type of touch used by petitioner with SM, based on the above findings and its ultimate conclusion, the ALJ implicitly found that petitioner did not use therapeutic touch or touch as a modality with SM.

In the final order, the board repeated the ALJ's findings with regard to the expert testimony, and, based on it finding Dr. Sorenson (the board's expert) persuasive, added that "a clinician must have a clear rationale for using touch as an intervention and should document its use in the chart." Dr. Sorenson's opinion was premised on petitioner using therapeutic touch. In contrast to the ALJ, the board found that petitioner's use of touch with SM violated professional standards because he touched SM "without first establishing a strong therapeutic alliance and failed to monitor SM's reactions, both verbal and non-verbal and to make a corresponding chart note," because his use of touch made SM "feel very uncomfortable," and because "the use of touch remains a developing form of treatment that requires a clinician to obtain informed consent and documenting that in the chart," which petitioner did not do.

In response to petitioner's exceptions, the board further clarified repeatedly that it found that petitioner's use of touch went "well beyond" what could be characterized as "general" touch and was instead used by petitioner as an

"intervention" in his therapy with SM. In the most salient of its clarifications, the board explained:

> "The Board affirms its findings, but wants to clarify that it is not stating that a clinician must chart every instance of casual touch during therapy. The Board's findings in this matter are predicated on the conclusion that [petitioner] engaged in more than casual touch. The Board has found that [petitioner] purposefully and repeatedly sat next to SM, put his arm around her to comfort her on repeated occasions during therapy sessions, hugged her at the end of sessions, placed his hands on her hips to guide her out of the office, and gave her a kiss on the cheek at the end of the last session. * * * This Board views such conduct as going beyond the use of 'general touch.' [Petitioner's] insistence that he was not using touch as a treatment modality during his sessions with SM is not persuasive. The Board is not creating a new standard, but is enforcing an existing standard that is well supported by the professional literature."

Thus, both the ALJ and the board found, based on the expert testimony, that touch as an "emerging area" in Ethical Standard 2.01(e) included touch as a modality or intervention, and not general or comforting touch. Likewise, based on Dr. Sorenson's testimony, and as clarified in the final order, for the board, it was only "touch as an intervention" that required a "clear rationale" and documentation in the chart. The ALJ and the board departed, however, on the finding of historical fact of what type of touch petitioner used with SM during her sessions.

On *de novo* review, and particularly taking into account the testimony of both experts, we agree with the ALJ's assessment of the evidence. As set out above, both the ALJ and the board concluded that touch as a treatment modality or intervention is an "emerging area," and that "general" or "comforting" touch is not. Based on that shared understanding and the expert testimony on the differences in those types of touch, we find that petitioner did not use touch as a treatment modality (nor, as variously stated by the board, as a "therapeutic intervention," an "intervention," or a "developing form of treatment") in his sessions with SM,

and that petitioner only ever used general or comforting touch with SM.[6]

The foregoing discussion leads naturally into petitioner's next challenge. Both the ALJ and the board discussed that physically touching a client requires the clinician to obtain the client's informed consent, and petitioner does not take issue with that concept. However, petitioner challenges the board's modification of findings of the ALJ that relate to whether petitioner obtained SM's informed consent. Specifically, petitioner points to the ALJ's findings that petitioner established that he asks before he touches a client, that SM agreed to petitioner touching her each time he asked, and that, though SM was uncomfortable, there was no evidence that established that petitioner should have been aware of her discomfort.[7] Although the board adopted the ALJ's finding that petitioner generally asks before touching a client, the board also ultimately found, contrary to those findings, that petitioner failed to always ask permission before touching SM and failed to observe her reactions to being touched.[8] We address only those two modifi-

---

[6] We note that, in making that finding, we express no opinion on whether the use of "general" or "comforting" touch can result in the violation of a professional standard. We presume, depending on the appropriateness of the touch under the particular circumstances of a case, it could. Here, however, our comments are limited to finding the disputed historical fact of the type of touch used by petitioner with SM, as defined by the persuasive expert testimony presented in this case.

[7] In two different sections of the proposed order, the ALJ found the following:

"[T]he evidence in the case only shows (from SM's recollections several years later) that there was some touch, that it made her ultimately uncomfortable, but she did not let [petitioner] know it made her feel uncomfortable. [Petitioner] is unable to respond to specifics, but has generally established that he asks permission before touching a client."

"[A]ll the evidence shows is that SM at some point became uncomfortable with [petitioner's] use of physical touch—touch she agreed to—and never told him about her discomfort. If this matter had been raised with [petitioner] in 2003 or 2004, valid questions could have been raised about whether he should have noticed her discomfort in the process of obtaining informed consent. SM did not do anything wrong by failing to advise [petitioner] of her discomfort with his touch. At this late date, it is not possible to determine whether [petitioner] should have noticed her discomfort without her mentioning it."

[8] For example, among others, the board made the following findings in three different parts of the final order:

"In this case, [petitioner] repeatedly touched [SM] in a manner that made her feel uncomfortable. [Petitioner] did not assess the effect his manner of

cations by the board, because petitioner's assignment does not address with specificity any of the other related board findings.

We first reject without discussion the board's preservation challenge to petitioner's assignment of error. On *de novo* review, we again find that the historical facts are as articulated by the ALJ. The board's contrary findings were explicitly made based on the lack of documentary evidence that petitioner obtained permission or assessed SM's reactions, specifically the lack of particularized chart notes by petitioner. However, through testimony, petitioner did establish that he asks for permission before touching a client, and SM admitted that she agreed to being touched when petitioner asked but could not recall how often he asked. Based on that evidence, we find that petitioner asked, and obtained, SM's permission before touching her. Also, the record does not contain evidence that would support a finding that petitioner failed to assess the observable reactions of SM to being touched by him. Petitioner testified that he makes an effort to observe the verbal and nonverbal reactions of a client to determine if the client is feeling comforted and stops the touch if he observes any discomfort. The board did not present any evidence to the contrary.

touch was having on [SM] and did not recognize that he was causing her discomfort."

"The Board finds that [petitioner] touched SM during the therapy sessions in 2003 without first establishing a strong therapeutic alliance and failed to monitor SM's reactions, both verbal and non-verbal and to make a corresponding chart note. It is not the responsibility of the client to articulate discomfort; rather, it is the duty of the clinician to obtain a client's informed consent and to monitor the client's reactions to be[ing] touched by the therapist. [Petitioner] failed to do this. A careful review of [petitioner's] chart notes reveals no mention of the use of touch during any session."

"It is imperative for a clinician to obtain the informed consent of the client before using touch as an intervention during therapy sessions. [Petitioner] failed to do so, as evidenced by his failure to document that discussion in the chart. The [b]oard recognizes that SM testified that [petitioner] asked her a couple of times if he could sit next to her on the couch, and recalls him asking her one time if he could put his arms around her or hug her. *** [Petitioner] failed to document his thought process or that he discussed the use of touch with SM. [Petitioner] also failed to document that he considered or discussed the risks or the alternatives to the use of touch, and failed to inform this teenage client that she had the right to tell him no."

We also briefly address petitioner's challenge to the board's modification of finding number 6. In that finding, the ALJ found that, in relation to investigating SC's complaint, Berry had phoned Nancy Wernecke, a mental health practitioner for SC, and told Wernecke that "she had sent her a release, not mentioning that the release was signed by SC's father and not SC," who was then 18 years old, so that Wernecke began telling the investigator protected information. The board modified that finding to find that the investigator could not remember whether she told Wernecke that she did not have a release signed by SC. On *de novo* review, we find that the investigator referred only to a "release" without telling Wernecke that the release was signed by SC's father and not SC.[9]

Although it appears that petitioner does raise additional challenges to modifications of historical fact that petitioner argues the board made, we do not address those challenges because petitioner raised them for the first time in his reply brief. *See, e.g., Clinical Research Institute v. Kemper Ins. Co.*, 191 Or App 595, 608-09, 84 P3d 147 (2004). We thus proceed to address petitioner's assignments of error regarding two additional findings made by the board in the final order.

As briefly noted above, when an agency makes findings that are in addition to those made by the ALJ, those additional findings are modifications of an ALJ's proposed order other than modifications of findings of historical fact. Under ORS 183.650(2), an agency is required to identify and explain those additional findings, and, ultimately, we review the additional finding for substantial evidence. *Becklin*, 195 Or App at 206. "Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.482(8)(c).

Petitioner first challenges the board's additional finding that petitioner "plac[ed] his arm around [SM], massaging

---

[9] In response to petitioner's assignment of error, the board argues only that the finding is irrelevant to its conclusions. Regardless of whether the board believes the modified finding of historical fact that it made was irrelevant, our task, under ORS 183.650(4), is to resolve that disputed historical fact. Thus, we address petitioner's assignment of error.

her neck and shoulders," a finding that petitioner asserts the board made "in passing" without explanation and without substantial evidence to support it. The board responds that it did not make that finding.

We reject the board's argument. In its responses to petitioner's exceptions, the board made explicit the finding of historical fact complained of by petitioner, which was only implicit in the body of the board's final order. That finding was not an explicit, nor implicit, finding in the ALJ's proposed order. The board did not identify or explain that additional finding, as required by ORS 183.650(2), which was error. Additionally, SM testified only that petitioner would put his arm around her when she was crying to console her and that petitioner would rub her shoulder or her neck "a little bit" while his arm was around her, but that it was not a massage. SM's testimony is very different in character from the board's finding; thus, we conclude that the board's finding is not supported by substantial evidence in the record.

Petitioner also challenges, as an additional finding by the board, the finding that SC refused to participate in the investigation of her father's complaint or sign a release. We reject petitioner's assignment of error because the board's finding neither modified nor added to the ALJ's proposed order, which also contained the finding that SC refused to participate in the investigation and did not sign a release. Additionally, there is substantial evidence in the record to support that finding.

Having found that several historical facts are not as found by the board, we must remand for the board to reconsider, under a correct understanding of the facts, its conclusions that petitioner violated ORS 675.070(2)(d) (unprofessional conduct), Ethical Standard 2.01 (boundaries of competence), Ethical Standard 3.04 (avoiding harm), and Ethical Standard 10.01 (informed consent) in his treatment of SM. As a result, we do not reach petitioner's other assignments of error, which challenge the board's interpretation and application of those professional standards under the board's view of the facts.

Reversed and remanded.