LAGESEN, P. J.
*431 This is a proceeding for judicial review under ORS 183.482 of a final order in a contested case revoking petitioner's Real Estate Principal Broker license. In revoking petitioner's license, the Real Estate Commissioner, carrying out the duties of the Real Estate Agency, found that petitioner provided materially misleading information in connection with the sale of residential real property, and that petitioner did so with the intent to mislead. In making those findings about petitioner's intent, the commissioner altered findings to the contrary by an administrative law judge (ALJ), who was not persuaded that petitioner possessed the intent to deceive but instead found that he had acted carelessly and made mistakes. On de novo review of the altered findings under ORS 183.650(4),[1] we, like the ALJ, are not persuaded that petitioner's misleading statements were the product of an intent to mislead and find that they more likely were the product of carelessness. We therefore reverse and "remand the matter to the [commissioner] for entry of an order consistent with the court's judgment," as further elaborated below. ORS 183.650(4).
I. BACKGROUND
A. Substantive Facts
Apart from the factual dispute about petitioner's state of mind, most of the facts that led to this proceeding are not disputed. In accordance with our standard of review, as noted, we draw the facts from the unchallenged findings in the order. Augustus v. Board of Nursing , 284 Or. App. 420, 421 & n. 2, 392 P.3d 788 (2017).
Petitioner has held an Oregon real estate license since 1988 and has been licensed in Oregon and Washington for more than 20 years. Petitioner's background in real estate extends back farther. He began working with his father in his father's Corvallis real estate company when he was 15 years old. His father's business specialized in income properties, as has petitioner's. Petitioner primarily buys, *432 sells, and manages income property and, in the course of that business, does not regularly represent other buyers or sellers, or engage in property development.
In 2004, petitioner purchased a 65-acre parcel of property from one of his former clients, Radke. The property is on Skyline Boulevard in Portland, is flat, and has views of the Columbia River and the Cascades. The property consists of three tax lots; petitioner bought them in a single transaction. The property has a house, a storage and shop building, and several other storage units. At the time of petitioner's purchase, it was zoned CFU (commercial forest use) 1.
Radke had acquired the bulk of the 65-acre property in 1966. It consisted of two separate tax lots at the time, and there had been a house on the property since at least 1942. The next year, Radke built a new house on the property approximately 100 feet away from the original home site. In subsequent years, Radke added the shop and storage structures.
Publishers Paper Company owned land adjacent to Radke's 65-acre parcel. In 1981, Radke exchanged with Publishers Paper 17.92 acres of heavily wooded land on the *182 downhill side of his property for 19.3 acres of land that were flat and fronted on Skyline. After deeding the pertinent property to each other, Radke and Publishers Paper executed a cutting boundary agreement. Publishers Paper then logged all 500 acres of its property, including the 17.92 acres it obtained from Radke.
In 1980, shortly before the trade between Radke and Publishers Paper, Multnomah County changed by map the zoning applicable to the 65-acre parcel, increasing the minimum acreage required for residential use to 80 acres. It confirmed that zoning change by rule in 1982. As a result of that change, the property, as of 1982, was not large enough for a new residential use.
When petitioner purchased the property from Radke in 2004, he knew that a new residence could not be built on the property because of the zoning. He also knew that the plumbing and electrical systems in the existing residence were not up to code. His plan was to bring the *433 existing residence up to code for his own personal use and to address any other compliance issues with the property through the City of Portland's "Get Legal" program. That program assisted owners of property in rural Multnomah County in bringing unpermitted, not-to-code improvements into compliance with city and county codes.
The property turned out to be more of a project than petitioner had anticipated. Petitioner's interest in the property did not include the logging rights. Approximately two months after petitioner purchased it, the party with the logging rights harvested the timber on the property. This revealed that Radke had disposed of "60 to 70% more waste on the property than was readily apparent prior to the harvest." The additional waste included 30 to 40 barrels of oil or solvents, 30 cars, and years of accumulated waste from apartments and ruined buildings. Then, in December 2004, a windstorm caused significant additional damage to the house and property.
When petitioner first purchased the property, he hired several people to help clean it up and bring the improvements up to code. One of those people introduced petitioner to Ernie Casella, and petitioner contracted with Casella to perform repair work after the windstorm. Casella told petitioner that he had experience resolving zoning issues with the city and county, and had helped other homeowners address issues similar to petitioner's. Casella had worked on projects in the Pearl District and other areas and, according to petitioner's research, had a reputation in the community for being thorough and professional. Petitioner then decided to hire Casella to resolve the zoning and building code issues with the property.
In March 2005, petitioner wrote a detailed letter to Casella that outlined the issues with the property and possible solutions. Among other things, he explained that the 19-acre tax lot created as a result of the 1981 land exchange had been red-flagged by the county as illegally created under the zoning at the time. He suggested that one way to solve the problem might be to merge the 19-acre lot with the other two tax lots to recreate the original 65-acre parcel. However, he also asked Casella to look into whether the *434 19-acre parcel could be split off from the other two and sold separately so that he could use the proceeds to keep the balance of the property and finish the work on the house.
After contracting with Casella, petitioner spent approximately $80,000 toward resolving the permitting and land use issues with the property. However, the clean up work on the property ultimately used up all of petitioner's funds and he decided to sell the property. Acting under his real estate broker's license, petitioner listed the property for sale on the Regional Multiple Listing Service (RMLS) in August 2005.
The RMLS listing format included an area for "Remarks" that allows the listing agent to include important information about the property. Petitioner's listing did not include any information about the 1981 land exchange or the zoning issues that arose from that exchange.
After petitioner listed the property, Maxson, another real estate licensee and petitioner's colleague, thought that the property might interest Donnelly, a friend of Maxson from college. Maxson previously had assisted Donnelly in buying residential and commercial *183 properties. Maxson also knew Casella and his reputation for successful permitting and construction projects, and knew that Casella worked with a particular mortgage broker, Crane. Maxson thought Casella and Crane would be a good fit with Donnelly and introduced them to him for the purpose of considering a joint purchase of the property. They decided to buy the property together for $650,000.
In January 2006, Donnelly, Casella, and Crane executed a preprinted form Residential Real Estate Purchase and Sale Agreement with petitioner. Although Donnelly, Casella, and Crane intended to form a limited liability company (LLC) to purchase the property, they signed the agreement in their individual capacities. About a month later, they executed an addendum stating that "[a]ll parties are aware that Purchasers will create an LLC as the purchasing entity." The form agreement that the parties executed in January contained a section labeled "Seller Representations." That section included the following statements:
*435 "(7) Seller has no notice from any governmental agency of any violation of law relating to the Property * * * (9) Seller agrees to promptly notify Buyer if, prior to closing, Seller receives actual notice of any event or condition which could result in making previously disclosed material information relating to the Property substantially misleading or incorrect. These representations are based upon Seller's actual knowledge. Seller has made no investigations. Exceptions to items (1) through (9) are: ________. Buyer acknowledges that the above representations are not warranties regarding the condition of the Property and are not a substitute for, nor in lieu of, Buyer's own responsibility to conduct a thorough and complete independent investigation, including the use of professionals, where appropriate, regarding all material matters bearing on the condition of the Property, its value and its suitability for Buyer's intended use."
(Underscoring in original.)
Although petitioner knew that the 1981 land exchange had resulted in an illegal division of the property at the time that he signed the agreement, he did not include that information on the form. Petitioner discussed the property with Casella and Crane, but Donnelly did not participate in those discussions. Petitioner's understanding during those discussions with Crane and Casella was that the two of them represented Skyline View, LLC (Skyline View), which was the LLC that Crane, Casella, and Donnelly formed to purchase the property. Petitioner did not know what Casella told Donnelly about the issues with the property.
In July 2006, petitioner completed a form Seller's Property Disclosure Statement. He checked the box marked "No" next to the question, "Are there any zoning violations or nonconforming uses?" Approximately 10 days later, petitioner signed a warranty deed transferring the property to Skyline View. The warranty deed stated that the property was "free of encumbrances."
Around the time of purchase, the property was appraised at $1,250,000. Donnelly's family LLC, the Chatfield Family LLC, supplied the down payment, loaning it to Skyline View. Neither Casella nor Crane put in any money. Donnelly's objective at the time of the purchase was to *436 complete the renovation of the existing house and sell the property, possibly retaining the 19-acre parcel for another residence.
In 2008, the property was reappraised by a private appraiser at $1,650,000. After that appraisal, Skyline View obtained a construction loan that was secured by the property. Part of the loan was used to repay the Chatfield Family LLC for the down payment loan and part was used to pay the balance of the purchase price for the property.
At some point after Skyline View had started work on renovating the existing house, Multnomah County issued a stop work order to Skyline View. In April 2008, the county notified Skyline View, through Crane and Donnelly, that it had determined that the county's zoning requirements prohibited the project, notwithstanding the permits that the City of Portland had issued allowing the project to proceed. The letter set forth several different pathways through which the violations might be resolved.
*184 Acting on behalf of Skyline View, Donnelly thereafter initiated an arbitration proceeding against petitioner and two of his companies, alleging that they had engaged in intentional fraud. The arbitration panel found in favor of Skyline View, awarding $666,450 in damages. Although petitioner was represented by counsel at the arbitration hearing, he was not represented for much of the time leading up to the hearing, which, in petitioner's view, affected the arbitration proceeding. Additionally, although Crane had told petitioner that he would appear as a witness at the arbitration and testify to certain facts, Crane failed to appear. Although Crane was reached by telephone and allowed to testify by phone, he testified differently from how he told petitioner he was going to testify. Judgment was entered on the arbitration award against petitioner on March 16, 2010.
At some point after the arbitration against petitioner, Donnelly sued Crane and Casella for fraud, and obtained money judgments against them. He then used those judgments to have Crane and Casella removed from membership in Skyline View. Skyline View has defaulted on its construction loan and, as a result, is at risk of losing *437 the property. Donnelly has not been able to collect on the arbitration judgment against petitioner or on the judgments against Crane and Casella.
On October 14, 2011, petitioner reported the March 2010 arbitration judgment against him to the Real Estate Agency, as required by the agency's rule, OAR 863-015-0175(4) (2009), which required real estate licensees to report any adverse judgments against them. Because the rule specified that a licensee must report any adverse judgments within 20 days of receiving notice of the adverse decision, petitioner's report was roughly a year and a half late.
B. Procedural Facts
The Real Estate Agency began investigating the matter and, in July 2012, issued a notice of intent to revoke petitioner's license. The notice alleged that petitioner's acts of (1) failing to reference the zoning issues in the RMLS listing; (2) failing to complete the Residential Real Estate Sale Agreement in a way that disclosed the zoning issues; (3) answering "no" to the question about whether there were zoning or nonconforming issues; and (4) signing a warranty deed representing that there were no encumbrances on the property each constituted "fraud or * * * dishonest conduct substantially related to the fitness of the licensee to conduct professional real estate activity" under ORS 696.301(14).[2] The notice further alleged that petitioner's failure to identify the zoning issues in the RMLS listing constituted the "knowing[ ] or reckless[ ] publi[cation] of materially misleading or untruthful advertising," in violation of ORS 696.301(4),[3] as well as the failure to "disclose material facts known by [petitioner]," as a real estate agent, "which are not apparent or readily ascertainable to a party in a real estate transaction" in violation of ORS 696.805(2)(c).[4] It alleged that petitioner's *438 failure to indicate the zoning issues on the sales agreement and his "no" answer to the zoning question on the seller disclosures also violated ORS 696.805(2)(c). Finally, the notice alleged that petitioner's failure to timely report the arbitration judgment violated OAR 863-015-0175(4) (2009).[5] The notice proposed that revocation of petitioner's license was the appropriate discipline for his conduct.
Petitioner requested a contested case hearing, and the case was referred to the Office *185 of Administrative Hearings (OAH) for a hearing before an ALJ. At the hearing, petitioner generally did not dispute that his conduct violated the agency rules. That is, petitioner did not dispute that he should have included information about the zoning issues in the RMLS listing, that he should have identified the zoning issues on the purchase and sale agreement and on the seller disclosures, that he should not have signed a warranty deed that stated that the property had no encumbrances, and that he should have reported the arbitration judgment within 20 days of the date that he knew of it. Instead, the main focus at the hearing was whether petitioner had acted with an intent to mislead or defraud Donnelly. Petitioner testified at the hearing that he did not have the intent to defraud or hurt Donnelly, that his conversations about the sale had been with Casella and Crane, and that Casella knew all about the zoning issues at the time Skyline View purchased the property. Petitioner explained that Casella told him at the time of the sale that he had been in touch with the county and that his plan, once Skyline View purchased the property, was to complete the renovation of the house through the "Get Legal" program that the City of Portland was operating on behalf of the county.
The ALJ ultimately credited petitioner's testimony and found that petitioner's omissions and misleading statements regarding the zoning issues with the property were the result of mistakes and carelessness rather than the intent to mislead. Based on her finding about petitioner's *439 mental state, the ALJ concluded that the agency had not demonstrated that petitioner "[c]ommitted an act of fraud or engaged in dishonest conduct substantially related to the fitness of the applicant or licensee to conduct professional real estate activity" in violation of ORS 696.301(14), and rejected all of the agency's allegations that petitioner had violated ORS 696.301(14). The ALJ also rejected the agency's allegation that petitioner violated ORS 696.301(4) when petitioner did not include information about the property's zoning issues in the RMLS listing, finding that petitioner had not acted knowingly or recklessly in publishing the misleading RMLS listing.
The ALJ did find, however, that petitioner violated ORS 696.805(2)(c), that is, that petitioner failed "to disclose material facts of which he was aware and which were not readily apparent or readily ascertainable to a party in a real estate transaction," through the RMLS listing, the purchase and sale agreement, and the seller disclosures when petitioner failed to supply accurate information about the zoning issues with the property. The ALJ also found that petitioner violated ORS 696.301(3) (requiring a real estate licensee to comply with agency rules) and OAR 863-015-0175(4) (requiring reporting of adverse decision against licensee).
After considering the factors in the agency's rule governing progressive discipline, OAR 863-027-0020(2), the ALJ recommended a one-year suspension of petitioner's real estate license, together with a period of probation. In reaching that conclusion, the ALJ explained that she was not persuaded by the evidence in the record that Donnelly had been significantly harmed by petitioner's conduct because the appraisals in the record suggested that the property was worth a lot more than Skyline View had paid for it. The ALJ also concluded that petitioner's lack of prior disciplinary issues during his lengthy career, his reputation in the community for "ethics and knowledge," and his cooperation with the agency throughout the investigation all weighed in favor of a sanction of suspension rather than revocation.
The commissioner modified the ALJ's order, including some of the ALJ's key factual findings. Most significantly, *440 the commissioner found that petitioner had the intent to mislead each time he failed to supply accurate information regarding the zoning issues in the RMLS listing, the purchase and sale agreement, the seller disclosures, and the warranty deed, and that those misrepresentations were not the product of petitioner's mistakes or carelessness, as the ALJ had found. Based on those modified findings about petitioner's mental state-that petitioner possessed the intent to mislead or deceive-the commissioner concluded, contrary to the ALJ, that petitioner violated ORS 696.301(14) by engaging in fraudulent or dishonest conduct on multiple occasions. *186 The commissioner also found that, in publishing the RMLS materials without supplying the information about the zoning issues, petitioner had both knowingly and recklessly published materially misleading information, in violation of ORS 696.301(4). The commissioner otherwise adhered to the ALJ's conclusions regarding petitioner's violations of ORS 696.805(2)(c) and his violation of his obligation to timely report the arbitration award.
Based on those conclusions, the commissioner determined that petitioner's license should be revoked. In so doing, the commissioner noted that the factors in its progressive discipline rule did not apply to conduct occurring before January 1, 2006, but did apply to petitioner's conduct occurring after that date. The commissioner reasoned that the fact that petitioner acted with an intent to deceive and the fact that Donnelly had "incurred substantial economic damage because of the zoning violations, and in pursuing [petitioner] through legal action," made revocation the appropriate sanction.
Petitioner filed exceptions to the order, including the commissioner's modification of the ALJ's findings that petitioner "did not intend to mislead or deceive the buyers and that [petitioner] did not cause any substantial harm to Donnelly." Petitioner also argued that the commissioner erred in concluding that its progressive discipline rule only applied to conduct occurring after January 1, 2006. Petitioner pointed out that the statute requiring the agency to promulgate that rule specifically stated that the procedures for progressive discipline would apply to the investigation of *441 conduct occurring on or after January 1, 2006. The commissioner adhered to his order. Petitioner timely filed a petition for judicial review.
On review, petitioner raises a number of disparate arguments in a single assignment of error.[6] Petitioner primarily contends that the commissioner erred in modifying the ALJ's findings that his failure to supply accurate information about the zoning issues at various times was the product of carelessness and that petitioner did not have the intent to mislead. Petitioner also contends that the commissioner erred in modifying the ALJ's finding that his omission of the information about the zoning issues from the RMLS materials was not reckless, and in modifying the ALJ's finding that she was not persuaded that Donnelly had suffered substantial damage as a result of petitioner's conduct. Petitioner further asserts that the commissioner erred in concluding that his conduct violated ORS 696.805(2)(c). Finally, petitioner contends that the commissioner erred in concluding that its progressive discipline rule only applied to his conduct occurring after January 1, 2006.
The commissioner, in response, acknowledges that he changed the ALJ's factual findings when he rejected the ALJ's finding that petitioner did not have the intent to mislead and found, instead, that petitioner did have that intent. He also acknowledges that he changed the ALJ's finding that petitioner had not acted recklessly in publishing the RMLS listing without the information about the zoning violation, as well as the ALJ's finding that Donnelly had not suffered substantial damage. He urges us, on de novo review, to find those facts in the same manner that he did. The commissioner asserts that petitioner's argument regarding the ORS 696.805(2)(c) violations is not preserved. Finally, the commissioner asserts that he correctly concluded that the progressive discipline rule applies only to conduct occurring after January 1, 2006, but that, if the rule does apply, any error is harmless.
*442 II. ANALYSIS
A. Modified Findings
As a result of the framework established by the legislature, the primary issues before us are factual ones that call on us to act as factfinders. ORS 183.650 authorizes an agency to modify a finding of historical fact by an ALJ from the OAH "only if the agency determines that there is clear and convincing evidence in the record that the finding was wrong." ORS 183.650(3). However, if an *187 agency modifies findings of historical fact[7] by an ALJ from the OAH, and those modifications are challenged on judicial review, we do not review to determine whether the evidence is sufficient to support the agency's determination that there is clear and convincing evidence that the ALJ's findings were wrong, or even to determine whether the agency comported with the requirement that it find, by clear and convincing evidence, that the ALJ's findings were wrong before modifying them. Weldon v. Bd. of Lic. Pro. Counselors and Therapists , 266 Or. App. 52, 62-63, 337 P.3d 911 (2014), rev. den. , 356 Or. 690, 344 P.3d 1112 (2015) (explaining our review process under ORS 183.650 ).[8] *443 Instead, in such circumstances, the legislature has assigned us the job of acting as a factfinding body ourselves, directing us to find the modified facts de novo :
"Notwithstanding ORS 19.415(3), if a party seeks judicial review of an agency's modification of a finding of historical fact under subsection (3) of this section, the court shall make an independent finding of the fact in dispute by conducting a review de novo of the record viewed as a whole. If the court decides that the agency erred in modifying the finding of historical fact made by the administrative law judge, the court shall remand the matter to the agency for entry of an order consistent with the court's judgment."
ORS 183.650(4) ; see Bice v. Board of Psychologist Examiners , 281 Or. App. 623, 629-30, 383 P.3d 913 (2016) (explaining process on review of challenged modifications of ALJ's findings of fact). In so doing, when a challenged finding of fact is based on a finding regarding a witness's credibility, "we must make an independent assessment of that witness's credibility." Bice , 281 Or. App. at 630, 383 P.3d 913. We must make our findings "based on our independent assessment of how the evidence preponderates,"[9] and are free to determine that the evidence in the record is inadequate to allow us to make a particular finding. Id.
*188 1. Findings regarding intent to mislead
We start with the commissioner's findings that petitioner had the intent to mislead when he omitted accurate information regarding the property's zoning issues from the *444 RMLS listing and from the purchase and sale agreement when he answered "no" to the seller disclosure question about zoning issues and nonconforming uses and when he signed the warranty deed representing that the property was free from encumbrances. On de novo review, we, like the ALJ, are not persuaded that petitioner had the intent to mislead. That is so for three primary reasons.
First, as to the documents related to the sale, the facts that (1) Casella was well versed in all of the issues with the property, including the zoning issues; (2) petitioner understood that the sale was to be to an LLC in which Casella was a member; and (3) petitioner had discussions with Casella about the sale and Casella's plans for the property, all make it unlikely that petitioner had the intent to mislead. Second, the record contains character evidence from three witnesses who are well acquainted with petitioner and the standards by which he conducts his real estate business. All opined that petitioner was an honest and ethical person who was committed to best practices in the profession.[10] Third, although we must evaluate petitioner's credibility independently from both the ALJ and the commissioner, we think it appropriate to give some weight *445 to the ALJ's credibility finding, as we typically do on de novo review of credibility findings made by a factfinder who had the opportunity to observe a witness's demeanor while testifying. See Dept. of Human Services v. C. P. , 285 Or. App. 371, 379, 396 P.3d 278, rev. den. , 362 Or. 94, 405 P.3d 150 (2017) (explaining that appellate court gives substantial weight to a trial court's demeanor-based credibility findings on de novo review).[11]
2. Findings regarding recklessness
We next address petitioner's challenge to the commissioner's modification of the ALJ's finding that petitioner's failure to include accurate information about the property's *189 zoning issues was not reckless. As noted, the commissioner modified the ALJ's finding and concluded that petitioner violated ORS 696.301(4) by recklessly publishing materially misleading or untruthful advertising. In the order, the commissioner defined "reckless" to mean " 'lacking in caution: deliberately courting danger,' or 'marked by a lack of foresight or consideration[.]' " (Citing Webster's Third New Int'l Dictionary 1896 (unabridged ed. 2002)). Before us, petitioner does not challenge the commissioner's definition of recklessness; he only challenges the commissioner's factual finding that his conduct was reckless.
On de novo review, we are persuaded that petitioner acted recklessly. It is undisputed that petitioner knew about the zoning issues, yet he did not disclose that information in the RMLS listing even though petitioner should have known, based on his experience as a realtor, that the information would be material to any potential purchaser. That *446 convinces us that petitioner acted in a manner characterized by a lack of foresight or consideration when he drafted the RMLS listing and, thus, recklessly.
3. Findings regarding substantial damage
Finally, petitioner challenges the commissioner's modification of the ALJ's finding regarding the extent of harm to Donnelly. The ALJ found that it was "less than was readily apparent" that Donnelly had suffered any harm as a result of petitioner's statutory violation. The commissioner modified that finding, finding instead that petitioner's conduct caused Donnelly to incur "substantial economic damage because of the zoning violations, and in pursuing [petitioner] through legal action." Based on that factual finding, the commissioner then concluded that petitioner's conduct resulted in "significant damage" to Donnelly within the meaning of ORS 696.396(2)(c)(A).
On de novo review, we are persuaded that petitioner's conduct more likely than not caused Donnelly to suffer "substantial economic damage." In particular, we are persuaded by the evidence presented regarding the arbitration proceeding against petitioner that petitioner's misrepresentations regarding the zoning violations caused Donnelly to suffer, at a minimum, close to $700,000 in economic damages. For that reason, we uphold the commissioner's finding on that point.
B. ORS 696.805(2)(c) Violations
Petitioner argues that "there is no support for the decision that Petitioner violated ORS 696.805(2)(c)" because, in his view, the information about the property's zoning issues was "readily ascertainable" and, therefore, petitioner did not have the obligation to disclose it under ORS 696.805(2)(c). That argument is unpreserved and we reject it for that reason.
C. Application of Progressive Discipline Rule
The final issue is whether the commissioner erred when it concluded that the progressive discipline rule, OAR 863-027-0020, did not apply to petitioner's conduct occurring before January 1, 2006. Although the commissioner argues *447 that any error in that regard would not require a remand on its own, we address the issue because, as elaborated further below, our finding that petitioner's misrepresentations were more likely the product of carelessness or mistake necessitates a remand for the commissioner to reconsider his conclusion that petitioner's conduct violated ORS 696.301(14) and to reconsider his sanction determination. The issue regarding the application of the progressive discipline rule thus inevitably will recur on remand.
We conclude that the commissioner erred. OAR 863-027-0020 implements the commissioner's statutory obligation under ORS 696.396(1) to "provide by rule for the progressive discipline of real estate licensees and an objective method for investigation of complaints alleging grounds for discipline under ORS 696.301." The legislature enacted ORS 696.396 in 2005 as part of a comprehensive act governing professional real estate activity. See Or. Laws 2005, ch. 393. In so doing, the legislature specified different effective dates for different parts of the measure. Specifically, the legislature provided that the amendments to ORS 696.301, which sets *190 forth the substantive grounds for discipline of real estate licensees, "apply to an act or an omission occurring on or after the effective date of this 2005 act." Or. Laws 2005, ch. 393, § 10(1). By contrast, the legislature provided that the provisions governing the procedures for investigating and sanctioning conduct by real estate licensees contained in ORS 696.396, which were newly enacted by Oregon Laws 2005, chapter 393, section 5, would apply "to investigation of an act or omission of a real estate licensee occurring on or after the effective date of this 2005 Act." Or. Laws 2005, ch. 393, § 10(2) (emphasis added).
Those two provisions of Oregon Laws 2005, chapter 393, section 10, persuade us that the legislature intended for the rules for progressive discipline required by ORS 696.396(1) to apply in any investigation occurring after January 1, 2006. Standing alone, Oregon Laws 2005, chapter 393, section 10(2), might be ambiguous as to whether it applies to investigations occurring after the effective date of the act (regardless of when the investigated acts or omissions occurred) or, instead, only to acts or omissions *448 occurring after the effective date of the act. However, reading Oregon Laws 2005, chapter 393, section 10(2), in conjunction with section 10(1) of the law, resolves any ambiguity. If the legislature had intended for the requirements of ORS 696.396 to apply only to acts or omissions of licensees occurring after January 1, 2006 (as distinct from acts or omissions investigated after that date), it would have stated that intention directly, as it did in section 10(1). Accordingly, we conclude that the rules for progressive discipline, and the other requirements of ORS 696.396 enacted by Oregon Laws 2005, chapter 393, section 5, apply whenever an investigation of a licensee's conduct took place after January 1, 2006. The commissioner erred in concluding otherwise, and should apply the rule for progressive discipline when assessing the appropriate sanction for petitioner's conduct on remand.
III. CONCLUSION
On de novo review of the factual findings that the commissioner modified, we have found some of the facts differently from the commissioner. Accordingly, as required by ORS 183.650(4), we "remand the matter to the agency for entry of an order consistent with the court's judgment." In this case, the finding on which we differ from the commissioner-that petitioner's misrepresentations were more likely the product of carelessness or mistake than intent to deceive-affects only one of the commissioner's violation conclusions: the commissioner's conclusion that petitioner violated ORS 696.301(14) in connection with each of the four misrepresentations. Our divergence from the commissioner on that fact does not affect the commissioner's conclusions that petitioner's conduct in publishing the misleading RMLS listing violated ORS 696.301(4), because we, like the commissioner, have found that that conduct was reckless. Our modified finding also has no bearing on the commissioner's determinations regarding petitioner's violations of ORS 696.805(2)(c), or his violation of ORS 696.301(3), which have not been challenged in this proceeding. On remand, the commissioner thus must reconsider his legal conclusions regarding whether petitioner's conduct violated ORS 696.301(14), in view of our finding regarding petitioner's mental state at the time that he made the misrepresentations at issue, *449 and must also reassess what disciplinary sanction is appropriate. Further, consistent with our conclusion above, the commissioner should apply the progressive discipline rule to identify the appropriate sanction for petitioner's conduct.
Reversed and remanded.
DeVore, J., concurring in part, dissenting in part.
DeVORE, J., concurring in part, dissenting in part.
Tasked with de novo review of points on which the Real Estate Commissioner differs with an administrative law judge (ALJ), the majority addresses a host of issues. See ORS 183.650(4) (providing for judicial review de novo of differing findings of fact); see also Bice v. Board of Psychologist Examiners , 281 Or. App. 623, 629-30, 383 P.3d 913 (2016) (roles of ALJ, commissioner, and court);
*191 Weldon v. Bd. of Lic. Pro. Counselors and Therapists , 266 Or. App. 52, 67-68, 337 P.3d 911 (2014), rev. den. , 356 Or 690, 344 P.3d 1112 (2015) (de novo review regardless whether commissioner properly found clear and convincing evidence to alter an ALJ finding).
Our decision leaves unchanged the agency's conclusion that petitioner violated ORS 696.301(3) and OAR 863-015-0175(4) by failing to report in a more timely fashion the adverse judgment in an arbitration decision finding petitioner liable for intentional fraud.
I concur in the majority's conclusions that petitioner was "reckless," in violation of ORS 696.301(4), when omitting mention of the zoning violation in information he published in the Regional Multiple Listing Service (RMLS); that petitioner failed to preserve a challenge to the agency's conclusion that, in violation of ORS 696.805(2)(c), he did not disclose material facts when failing to report the zoning violation in the RMLS listing, in the sales agreement, and in the disclosure statement; and that the buyers' successor entity (Skyline View, LLC) or Donnelly's family trust (Chatfield Family LLC) suffered "significant damage" within the meaning of ORS 696.396(2)(c)(A) and that the progressive discipline rule of OAR 863-027-0020 under ORS 696.396(1) applies to the investigation of all acts at issue in this case.
*450 Unlike the majority, I agree with the commissioner that petitioner was "dishonest" in violation of ORS 696.301(14) with regard to his public obligation as a real estate licensee to be accurate and truthful when completing (a) RMLS listing, (b) a sales agreement, (c) a disclosure form, and (d) a warranty deed. Indeed, as the commissioner concluded, those several acts of dishonesty, taken together, indicate an "intent to deceive," which may be considered on the ultimate issue involving the appropriate sanction. To explain my differing opinion about dishonesty, I begin by outlining the statutes that frame the issues.
DISCIPLINARY FRAMEWORK
One statute describes the serious circumstances that may lead to license suspension or revocation, while other statutes provide the particular grounds for discipline of a real estate licensee. When addressing suspension or revocation, ORS 696.396(2)(c) provides that the rules that authorize the Real Estate Agency to discipline may not authorize the agency to suspend or revoke a real estate license unless
"material facts establish a violation of a ground for discipline under ORS 696.301 that:
"(A) Results in significant damage or injury;
"* * * * *
"(C) Exhibits dishonesty or fraudulent conduct; or
"(D) Repeats conduct or an act that is substantially similar to conduct or an act for which the real estate licensee was disciplined previously."
ORS 696.396(2)(c) (emphasis added). Prior discipline does not appear in the facts of this case, so suspension or revocation may occur here only if the facts show either (a) "significant damage" or (b)(1) "dishonesty" or (b)(2) "fraudulent conduct." Because those terms are provided in the alternative, suspension or revocation could be based solely on a violation of ORS 696.301 that caused significant damage, even without dishonest or fraudulent conduct.
As charged in this case, several subsections of ORS 696.301 were alleged as grounds for discipline.[1] In particular, *451 two subsections provide that the commissioner may discipline a licensee who has:
"(4) Knowingly or recklessly published materially misleading or untruthful advertising.
"* * * * *
"(14) Committed an act of fraud or engaged in dishonest conduct substantially related to the fitness of the applicant or real estate licensee to conduct professional real estate activity, without regard to whether the act or conduct occurred in the course of professional real estate activity."
ORS 696.301(4), (14). In addition, ORS 696.805 imposes duties on a real estate licensee *192 who acts as a seller's agent, as did petitioner. In relevant part, that statute provides that a seller's agent owes duties:
"(c) To disclose material facts known by the seller's agent and not apparent or readily ascertainable to a party."
ORS 696.805(2)(c). The majority's opinion resolves ORS 696.301(4) against petitioner based on reckless advertising with RMLS and, given petitioner's failure to preserve any alleged error, sustains the commissioner's finding against petitioner for a disclosure failure under ORS 696.805(2)(c). On those points, I concur. I respectfully disagree as to the majority's characterization of petitioner's nondisclosures as a careless or reckless "mistake."
BACKGROUND
Petitioner testified that, at the time he sold the property through his FOXC, LLC, he knew that the county regarded the property as having been illegally divided. Some years before, in 1981, his predecessor Radke had traded about 18 acres, taken from his two tax lots, for a timber company's lot of about 19 acres, which became Radke's third tax lot. Radke had built a house on one lot and a shop building on another lot. After the land division, the house was left on a lot reduced from 26.7 acres to 16 acres. Even if all three lots could be treated as one lot, they totaled only 65 acres, which was still less than the 80-acre minimum single lot size set in the zoning of 1980, the year before the trade.
*452 Petitioner knew that the county had "red-flagged" the property.[2]
Petitioner testified that he understood that the RMLS listing includes a "remarks" section where an agent puts information that a buyer would want to know. He admitted that, in 2006, he was responsible for a listing that left the section blank without reference to the zoning violation. He signed and initialed the sales agreement in which the seller represented that the "[s]eller has no notice from any governmental agency of any violation of law relating to the property." In the sales agreement, petitioner also agreed to promptly notify the buyers if, prior to closing, he received notice of a condition that could make the information that he had provided substantially misleading or incorrect. He signed a statutorily mandated property disclosure form that checked "no" in response to the question, "Are there any zoning violations or nonconforming uses?"[3] Finally, he signed the warranty deed that assured that there were no encumbrances on the property.
Donnelly, through his family trust operating as Chatfield Family LLC, provided the money that was the down payment for the purchase. The three buyers-Donnelly, Crane, and Casella-purchased the property as individuals, although they intended to soon form Skyline View LLC. Petitioner knew that they planned to upgrade the house and resell the property. Skyline View secured a bank loan, based on Donnelly's family trust assets. Neither Crane nor Casella put any money into the transaction. Donnelly was the "money partner."
Donnelly testified that petitioner did not tell him about the zoning violation. Crane and Casella failed to tell him, too. The zoning violation was the reason the county issued its order forbidding further work on the house to *453 meet current construction codes. Donnelly explained that the zoning violation meant that no one can occupy the house and that the property could not be resold representing the property as a "house with acreage." In essence, he said, "It's a tree farm." The property had been logged just after petitioner bought it, and, because it was inadequately replanted, the buyers had been forced to pay for some tree planting. Donnelly testified that, if he had been told of the zoning problem, he would not have invested in the property. *193 On behalf of Skyline View, Donnelly filed a claim against petitioner, and petitioner agreed to binding arbitration before a panel of arbitrators. Although initially unrepresented, petitioner retained counsel for the arbitration hearing. In that arbitration, Donnelly, on behalf of Skyline View, alleged common-law fraud. He contended that the measure of damages was the difference between the purchase price of the property and its actual value in light of its problems, plus the money paid in the attempt to rehabilitate the property in preparation for the intended resale. In its decision letter, the arbitration panel announced that:
"The panel unanimously finds that Respondents [petitioner personally, FOXC, LLC, and petitioner's Estate Builders, Inc.] are liable to Claimant on Claimant's claim of intentional fraud. The panel calculates Claimant's damages to be $666,450."
In due course, a judgment was entered on the Arbitration Award against petitioner for that sum. Donnelly said, however, that the judgment has proven to be uncollectible.
DISHONESTY
As noted at the outset, this court reviews de novo on those points of disagreement where the commissioner rejects the ALJ's findings. See ORS 183.650(4) (providing judicial review de novo on factual disagreement); see also Bice , 281 Or. App. at 629-30, 383 P.3d 913 (judicial review); Weldon , 266 Or. App. at 67-68, 337 P.3d 911 (judicial review). In doing so, "we are not limited to choosing between the ALJ's finding and the agency's finding; instead, we must make the finding based on our independent assessment of how the evidence preponderates." Bice , 281 Or. App. at 630, 383 P.3d 913. For example, in *454 Corcoranv. Board of Nursing , 197 Or. App. 517, 529-30, 107 P.3d 627 (2005), we posited a situation in which an ALJ found the traffic light was green, but the agency found the traffic light was red. We explained:
"Bluntly: The statute does not say that we are to determine, as between the ALJ's and the agency's conflicting findings, which comes closer to historical 'truth.' Rather we are to find the disputed fact(s) 'independent[ly].' Thus, if we determine on de novo review that the preponderance of the evidence in the record establishes that 'the light was yellow,' we must so find."
Id. (brackets and emphasis in Corcoran ). In reviewing de novo a finding of "historical fact," the court must also make its own assessment of related matters including witness credibility. Id. at 529, 107 P.3d 627 ; Bice , 281 Or. App. at 630, 383 P.3d 913. In addition to those novel features of review under ORS 183.650(4), the court retains its responsibility on review to correct an agency's interpretation of law under ORS 183.484(5)(a). Indeed, when an issue on appeal requires a correct understanding of a statute, the court must give a correct construction of a statute whether or not a party has asserted that construction. Stull v. Hoke , 326 Or. 72, 77, 948 P.2d 722 (1997).
For the court to conduct this review, it is necessary to note how the ALJ and the commissioner differed.[4] As for the failure to disclose the zoning violation in the RMLS listing information (denoted as Allegation 2.1), the ALJ found that petitioner had a good faith and reasonable belief that the violations were to be resolved by Casella in the future and, as a consequence, petitioner's omission was a "mistake" that was unintentional and not reckless. The ALJ concluded that, because the omission was a mistake, petitioner "could not have formulated the intent necessary to find his conduct dishonest." As for the false statements in the Sale Agreement (Allegation 2.2), the ALJ similarly found a "mistake," that *455 petitioner had an honest and good faith belief that the zoning issues would be remedied in the future, and that there was no evidence that petitioner engaged in dishonest conduct or committed an act of fraud. As for the disclosure *194 statement (Allegation 2.3), the ALJ concluded that petitioner's false answer-that there was no zoning violation or nonconforming use-was not dishonest nor a fraudulent act. On that point, she opined that petitioner was not obligated to ensure that Casella had disclosed the zoning violation to Donnelly. Finally, as to the warranty deed (Allegation 2.4), the ALJ concluded that petitioner's false statement about encumbrances was not dishonesty or fraud because petitioner had an honest and reasonable belief that the problem would be cured in the future and that Donnelly's partners knew of the problem.
The commissioner rejected the ALJ's findings of unintended mistakes and instead found repeated dishonesty. In each of the "Conclusions of Law" pertaining to four violations of ORS 696.301(14), the commissioner concluded that petitioner "engaged in dishonest conduct related to his fitness to conduct professional real estate activity." In those four separate findings, the commissioner did not make a specific finding of intentional fraud in those words. When explaining his four findings of "dishonesty," the commissioner elaborated in the "Opinion" portion of his Final Order.
As to the failure to disclose the zoning violation in the RMLS listing information (Allegation 2.1), the commissioner rejected the idea that it sufficed to think that the zoning violation might be remedied in the future or that some of the individual buyers were aware of the problem. The commissioner stressed that it was not a defense to say that one of the buyers was already aware of the zoning problem because petitioner, as a licensed principal broker, "has an independent duty not to publish materially misleading information." (Emphasis added.) The commissioner found that, given petitioner's experience and his knowledge of the problem, it was not credible to describe the omission as "a simple oversight." The commissioner relied on a dictionary definition of "dishonest" as meaning "characterized by lack of truth, honesty, probity, or trustworthiness, or by an inclination to mislead, *456 lie, cheat or defraud." Webster's Third New Int'l Dictionary 650 (unabridged ed. 2002). The commissioner concluded that because petitioner's acts misled Donnelly into looking at the property as an investment, the acts were "inclined to mislead Donnelly * * * and were therefore dishonest."
The commissioner's explanation was similar concerning the other three allegations. The commissioner concluded that petitioner's failure to disclose the problem in the Sales Agreement concealed facts and was done in a "dishonest manner" (Allegation 2.2); that petitioner's false answer in the Disclosure Statement was designed to mislead and so fit "squarely within the definition of 'dishonesty' " (Allegation 2.3); and that petitioner's failure to disclose the encumbrance in the warranty deed also fit "squarely within the definition of 'dishonesty' " (Allegation 2.4).
After those findings of "dishonesty" on the four allegations, the commissioner turned to the ensuing issue of choice of sanction. In discussing that final issue, the commissioner referred to his preceding conclusions of dishonesty and observed:
"At each opportunity to disclose, as set out in the findings of fact, Licensee failed to do so. The Commissioner rejects the ALJ's conclusion that these omissions were merely mistakes on the part of Licensee. There was a consistent pattern in his failure to disclose that the Commissioner believes is compelling and establishes that Licensee acted with an intent to deceive so that he could effect a sale of the property."
Like the majority, I recognize that the commissioner ultimately based the choice of sanction on a collective conclusion that petitioner had an "intent to deceive." The commissioner did so within the broad meaning of "dishonesty" that he had earlier recited and that appears within the context of the "independent duty" of a real estate licensee to the public. As noted, ORS 696.301(14) provides that the commissioner may suspend or revoke a license of an applicant who has "[c]ommitted an act of fraud or engaged in dishonest conduct substantially related to the fitness of the * * * licensee to conduct professional real estate activity. " (Emphasis added.)
*457 Unlike the majority, I read the commissioner's conclusions on each of the four allegations to be based on the "dishonesty" option *195 in ORS 696.301(14), rather than on the "fraudulent act" option. Earlier, when describing the multiple issues presented under the various statutory provisions, the commissioner had noted both the fraudulent act option and dishonesty option posed by ORS 696.301(14). Yet, when announcing his conclusions on those issues, the commissioner was careful as to each allegation to phrase his findings in terms of "dishonest conduct related to [petitioner's] fitness to conduct professional real estate activity." When conducting our de novo review, I believe that the court should make the same factual findings.[5]
This court's finding about the character of petitioner's conduct begins with the undisputed "historic facts" that petitioner failed four times to disclose a known zoning violation and nonconforming use despite repeated circumstances where he was expected or required to disclose the problems. The only question for this court is whether the record shows a persuasive excuse or explanation that leaves the repeated failures in the realm of careless misunderstanding or recklessness. It is a question whether petitioner's repeated omissions fall short of dishonesty in terms of his independent duty as a broker or dishonesty with intent to deceive. Ten facts point to a persuasive answer.
First, petitioner is licensed as a "principal broker." That designation is an advanced form of occupational licensing known better to the commissioner than many others. To become an ordinary broker, formerly known as a real estate agent, an applicant must complete a course of study at a licensed school. OAR 863-014-0035(1)(b), (c). That study requires at least 150 hours in seven courses that include real estate law, Oregon real estate practice, contracts, agency law, and real estate brokerage. OAR 863-022-0010(1), (2).
*458 In order to become a principal broker, the applicant must have had three years of active licensed real estate experience and complete additional study. OAR 863-014-0040(1)(a), (d). That study is an additional 40 hour of courses including brokerage business practices, real estate law, Oregon real estate practice, contracts, agency law, and real estate brokerage. OAR 863-022-0025(3). Brokers and principal brokers must then pass their respective examinations. OAR 863-014-0035(1)(d) (brokers) ; OAR 863-014-0040(1)(d) (principal brokers). Thereafter, brokers and principal brokers must satisfy continuing education requirements, in order to renew their licenses. Ongoing education involves 30 hours of study over two years, and that study must include several hours devoted to recent changes in real estate rules and law. OAR 863-020-0010(2). Other topics for continuing education include land use planning, zoning or other public limitations on use; real estate title; real estate contracts; commercial real estate; business ethics; real estate consumer protection; real estate disclosure requirements; and misrepresentation in real estate transactions. OAR 863-020-0035(4). As a principal broker, petitioner had studied before exams, passed two exams, and satisfied such continuing education requirements.
Second, although petitioner does not regularly engage in property development, he has extensive experience as a real estate broker. He buys and sells properties. In that work, he has traveled all over the state for years. He does not need to advertise because he has his own clientele. He grew up in his father's real estate practice, and has had his own practice for 20 years. He supervises four other brokers and has supervised as many as six brokers. In short, he knows well a broker's work and his responsibilities as a supervising principal broker.
Third, petitioner was familiar with the documents employed in the sale of his property on Skyline Boulevard. He is familiar with RMLS listings because about half of his inventory consists of residential listings in RMLS. The "remarks" section of a listing is one that he described as the place where a broker puts the information that a buyer *196 would want to know. The Sales Agreement was a "common *459 form" with which he was familiar, as would be any real estate licensee. He reviewed it, initialed its pages, and signed it. The Property Disclosure is a lengthy disclosure form that is mandated by statute, intended to protect unsuspecting buyers, and specifically calls out zoning violations and nonconforming uses. See ORS 105.465 (requiring use of property disclosure statement); ORS 105.464 (listing representations or disclosure required). The warranty deed, likewise, is a statutory form, which covenants against encumbrances, and which a principal broker would see regularly. See ORS 93.850 (warranty deed form).
Fourth, petitioner did not testify that, at the time of the transaction, he did not understand the documents that he and the buyers employed. He did not testify that, when the RMLS listing was advertised to the general public, he believed that the public did not need to be told of the zoning violation because he already knew who he would find to buy the property (if he did) and that buyer did not need to see the disclosure. He did not testify that he misunderstood the Sale Agreement when it represented that he had no notice of a zoning violation concerning the property. Critically, he did not testify that he did not understand that the representation concerned the present-day status of the property, not its future fix. He did not testify that he checked the "no" box on the Disclosure Statement when it asked about a zoning violation and nonconforming use because he believed the hope for a future fix meant that there was no present violation. He did not testify that he did not understand the term "encumbrance" when his deed covenanted that there were none.
Fifth, petitioner did not explain his repeated omissions. To be precise, petitioner did not testify that he made a "mistake." At the hearing before the ALJ, his attorney did make that argument , but petitioner himself did not use that word in his testimony. More importantly, petitioner did not explain why a seasoned principal broker who was familiar with the meaning of all of the documents failed four times to disclose a present problem with the property-a critical problem of which he knew.
*460 Sixth, petitioner's silence at the time of the transaction is consistent with his admitted reluctance to have the zoning issue surface as a problem. Before the transaction, he had attempted to clean up the property and bring it into compliance with building codes. In 2005, petitioner had written Casella, whom he had engaged as a contractor, to tell him about the property, including the zoning problem. Petitioner explained that he had limited his own contacts with the county to one visit in order to "keep their interest low ."[6] At the hearing, petitioner explained the letter by saying that he did not want to address the land issue until he had the property cleaned up. As it happened, petitioner ran out of money and decided to sell the property as it was. The problems of an unlawful land division or a nonconforming use would have surfaced if petitioner had flagged the problems in the RMLS listing, which was posted to the public, or if he had flagged the problems in the Sales Agreement, Disclosure Statement, and warranty deed, which would be reviewed by Donnelly, by Skyline View's lender, or by the property appraisers. Petitioner would know that a larger circle of participants review and rely on the transaction documents. It is reasonable to conclude, in the absence of any explanation from petitioner, that he preferred that the property's serious problems not become a matter of general notice .
Seventh, credibility does not favor petitioner. Although petitioner made a favorable impression on the ALJ, who found him credible when his attorney argued "mistake," credibility may be determined in a variety of ways. "We have recognized that 'credibility depends not only on demeanor but also on such factors as inherent probability, or improbability of the testimony, the possible internal inconsistencies, the fact that it is or is not corroborated, that it is contradicted by other testimony or evidence and finally that human *197 experience demonstrates it is logically incredible.' " Osuna-Bonilla v. Teacher Standards and Practices Comm. , 282 Or. App. 260, 268-69, 386 P.3d 229 (2016) (quoting Preferred Funding, Inc. v. Jackson , 185 Or. App. 693, 699, 61 P.3d 939 (2003) ). Although the majority would give *461 some weight to the credibility determination of the ALJ, our unique review under ORS 183.650(4) makes credibility ultimately a determination of this court. On these facts, petitioner's argument about mere mistake is not persuasive, given contrary evidence that petitioner, knowing his profession and knowing the zoning violation, would carelessly, rather than deliberately, omit disclosure four times.
Eighth, based on these same facts, petitioner has already been found liable in a common law claim of intentional fraud that was litigated and resolved in arbitration. That arbitration award was made a judgment.[7] The arbitrators' adverse finding is in the record here, and, if nothing else, its unfavorable outcome serves to offset whatever weight could be given to the ALJ's favorable impression of credibility.
Ninth, petitioner's evidence of his good character was offered only for purposes of showing mitigating circumstances on the issue of a choice of sanction within the scheme of progressive discipline. It was not offered by petitioner on the issue of determining the nature of his acts or omissions based on an inference to be drawn from his general good character. Administrative proceedings have lenient evidentiary rules. See ORS 183.450(1) (evidence in contested cases generally). Nevertheless, on the question of a person's motive or the nature of the person's act, a person's general character is of doubtful relevance even in an administrative hearing. See id. (providing that irrelevant or immaterial evidence shall be excluded and that all other evidence of a type commonly relied upon by reasonably prudent persons in the conduct of their serious affairs shall be admissible).
*462 Tenth, petitioner's argument that Casella was aware of the zoning violation is no excuse for petitioner's nondisclosures and false statements in the transaction documents. As it happened, Donnelly was the "money partner," and he testified that petitioner, Casella, and Crane did not tell him of the violation. In any event, it was no excuse for petitioner to rely on Casella to inform Donnelly because the transaction documents asked for truthful disclosures about the present-day status of the property. The documents were familiar to this real estate licensee. Unlike an inexperienced lay person, a principal broker would know that a false document cannot be remedied by the hope that someone with knowledge would have told someone else. As the commissioner observed, petitioner had an "independent duty" as a real estate licensee to prepare documents honestly. The public interest requires that such documents, on their face, be reliable. Others rely on them. Petitioner's public duty is an expression of professional licensing. That licensing is intended "to assist in creating for the public a healthy real estate market atmosphere and to assure that professional real estate activity is conducted with high fiduciary standards." ORS 696.015 (legislative findings on need for real estate licensing).
Taken together, those facts should lead this court to the same finding-the same as that the commissioner made as to the four allegations-that petitioner "engaged in dishonest conduct related to his fitness to conduct professional real estate activity" within the meaning of ORS 696.301(14). Further, those facts should lead this court to reach a finding, like the commissioner's finding, that *198 the omissions and false statements, in their effort to avoid general notice, were a form of dishonesty indicating "intent to deceive." Although I agree with the majority that such findings represent conduct that is out of character for this experienced licensee with no prior discipline, I respectfully dissent from that part of the majority's opinion finding the conduct in this transaction of a lesser character that is only a "mistake."

Our review is de novo only as to any modified findings of fact. Otherwise, we are bound by the unchallenged findings in the order on judicial review. Augustus v. Board of Nursing , 284 Or. App. 420, 421 & n. 2, 392 P.3d 788 (2017).

ORS 696.301(14) prohibits a real estate licensee from committing "an act of fraud or engag[ing] in dishonest conduct substantially related to the fitness of the * * * licensee to conduct professional real estate activity."

ORS 696.301(4) prohibits a real estate licensee from "[k]knowingly or recklessly publish[ing] materially misleading or untruthful advertising."

ORS 696.805(2)(c) imposes upon a seller's agent in a real estate transaction a duty "[t]o disclose material facts known by the seller's agent and not apparent or readily ascertainable to a party."

As noted, this rule, which was in effect at the time that petitioner received notice of the arbitration judgment, required licensees to report to the commissioner adverse decisions or judgments in any lawsuit or arbitration within 20 days of receiving notice of the decision. OAR 863-015-0175(4) (2009). ORS 696.301(3) requires real estate licensees to comply with "any rule of" the commissioner.

To the extent that petitioner's assignment of error can be construed to raise issues other than those expressly addressed in this opinion, we reject them without further written discussion.

Although the factual findings modified by the commissioner in this case were contained in the "Conclusions of Law" section of the ALJ's proposed order, rather than the "Findings of Fact" section, the agency correctly does not dispute that the facts modified by the commissioner qualify as historical facts for purposes of ORS 183.650. ORS 183.650(3) explains:
"For the purposes of this section, an administrative law judge makes a finding of historical fact if the administrative law judge determines that an event did or did not occur in the past or that a circumstance or status did or did not exist either before the hearing or at the time of the hearing."
The modified findings at issue satisfy that definition.

This limitation on our scope of review poses some concerns in this case and may undercut the OAH's capacity to carry out its legislatively intended function of ensuring neutrality in the factfinding process in administrative proceedings. See Corcoran v. Board of Nursing , 197 Or. App. 517, 523, 107 P.3d 627 (2005) (explaining that the "impetus for [the] legislation [creating the OAH] was that administrative agencies acted as both the 'prosecutor' and the 'adjudicator' in contested cases, giving rise to concern about inherent conflict and perceptions of bias"). Although the legislature's requirement that we review modified factual findings de novo provides a check on an agency's ability to modify factual findings for non-neutral reasons, it is clear from the legislative scheme that the legislature viewed the OAH as the body most suited to ensure neutrality in factfinding in agency proceedings and, for that reason, gave the OAH primary responsibility for factfinding in contested cases, and set a high standard for an agency to change a finding of fact by an ALJ at the OAH. This allocation of primary responsibility for ensuring neutral factfinding to the OAH makes sense because the ALJs at the OAH have the opportunity to observe live witness testimony and to make demeanor-based credibility findings, whereas this court can only make findings based on a paper record.
In this record, there is little indication that the commissioner inquired whether the record contained clear and convincing evidence that the ALJ's factual findings were wrong before he modified them. Although the record in this case contains evidence that is legally sufficient to support the competing findings made by the ALJ and the commissioner, it is at least questionable whether the evidence is legally sufficient to permit an affirmative finding, by clear and convincing evidence, that the ALJ's view of the facts was the wrong one.

We note that petitioner asserts that we must apply a clear-and-convincing-evidence standard of proof in determining whether petitioner possessed an intent to mislead or defraud. For that proposition, petitioner relies on past decisions of this court. We recently overruled the line of cases on which petitioner relies, in Dixon v. Board of Nursing , 291 Or. App. 207, 212, 419 P.3d 774 (2018), concluding that, under Oregon's Administrative Procedures Act, the preponderance-of-the-evidence standard applies.

The dissenting opinion asserts that the evidence about petitioner's character "was not offered by petitioner on the issue of determining the nature of his acts or omissions based on an inference to be drawn from his general good character" but was offered only for the purpose of demonstrating mitigating circumstances for purposes of determining the appropriate sanction for petitioner's conduct. 292 Or. App. at 461, 426 P.3d at 197 (DeVore, J., concurring in part, dissenting in part). Although petitioner certainly offered the evidence for the purpose of the determination of the sanction, petitioner also argued that the evidence "relate[d] to * * * whether the licensee's conduct was inadvertent or intentional, what was his past practices and type of transactions." The ALJ admitted the evidence without limitations. The dissenting opinion also appears to rely on OEC 404(2) in evaluating what weight to give petitioner's character evidence. But, as the dissenting opinion also appears to recognize, that rule is beside the point in this administrative proceeding. ORS 183.450, not the evidence code, governs the admission of evidence in contested cases. Evidence is admissible if it is "of a type commonly relied upon by reasonably prudent persons in conduct of their serious affairs," and is otherwise subject to exclusion only if it is "[i]rrelevant, immaterial or unduly repetitious." ORS 183.450(1). We are persuaded that the character testimony from people familiar with petitioner and his history in the real estate business is the sort of evidence that reasonably prudent people would rely on in assessing what type of realtor petitioner is, and to determine whether his misrepresentations were the product of carelessness or an intent to deceive. Reasonably prudent people rely on that type of information regularly to make important decisions about whom to employ to render professional services.

The dissenting opinion would reach a different result on this record and find that petitioner did have the intent to deceive when he made the misrepresentations in question. There is nothing legally incorrect about that finding. As noted, this case is not about the legal sufficiency of the evidence to support a particular finding; we are all simply discharging a statutory obligation to act as factfinders on the facts modified by the commissioner and simply do not see the evidence in the same ways. In some places, however, the dissenting opinion appears to go beyond the narrow task presented and assess the legal question of whether the commissioner was correct to conclude that petitioner's conduct violated the prohibition on fraudulent or dishonest conduct contained in ORS 696.301(14). That inquiry is beyond the scope of our review. Our job in reviewing the modified factual findings is to find those facts ourselves. Whether those facts, as we find them, demonstrate that petitioner violated a particular statute or rule is a question for the commissioner on remand in the first instance. See Bice , 281 Or. App. at 638, 383 P.3d 913.

The agency found a violation of ORS 696.301(3) for petitioner's late reporting of an adverse judgment and that violation is not disputed on appeal.

There was no evidence that petitioner or his predecessor Radke had ever taken the necessary steps to secure the county's recognition of a lawful nonconforming use. Instead, petitioner testified that he had engaged Casella to seek code compliance on building, electrical, structural, or septic issues, and petitioner had deliberately minimized his own contact with the county to just one visit in order to "keep their interest low."

See ORS 105.465 (mandating use of property disclosure statement); ORS 105.464 (setting forth representations or disclosure required).

I concur in the majority's observation that "there is little indication that the commissioner inquired whether the record contained clear and convincing evidence that the ALJ's factual findings were wrong before he modified them." 292 Or. App. at 442, 426 P.3d at 187 n. 8 (2018). For the reasons that follow, I believe that the record contained sufficient evidence for the commissioner to have done so, but, in any event, it becomes the court's own task to resolve de novo those differing factual findings. Bice , 281 Or. App. at 630, 383 P.3d 913.

This separate opinion does not seek to apply ORS 696.301(14) to the facts, contrary to our standard of review. That is, indeed, the task of the commissioner on remand. Rather, this opinion suggests that, on this record, the court's findings of fact should coincide with the commissioner's findings, which were addressed to and made with particular appreciation for that part of ORS 696.301(14) that concerns engaging "in dishonest conduct substantially related to the fitness of the * * * real estate licensee to conduct professional real estate activity."

Petitioner wrote, "I have not gone to the county, but one time about a year ago to keep their interest low."

Petitioner has resisted the effect of the arbitration determination by criticizing his attorney, a failure to offer evidence of the appraisals, and a failure to have included his argument about forest practices statutes compelling a land use solution. The arbitration, however, was a proceeding to which he agreed and in which he was represented by counsel. We need not entertain an implicit challenge to the judgment on the arbitration award, nor treat that judgment as a matter of issue preclusion on petitioner's motive. See Nelson v. Emerald People's Utility Dist. , 318 Or. 99, 104, 862 P.2d 1293 (1993) (elements of issue preclusion); see also Barackman v. Anderson , 338 Or. 365, 109 P.3d 370 (2005) (insurance arbitration given preclusive effect on damages in personal injury action). Instead, this court, like the ALJ or commissioner, can make its own assessment of the character of petitioner's acts and omissions, given all the evidence in this proceeding.